UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 22-52950-PMB |
| | : | |
| ATLANTA LIGHT BULBS, INC. | : | CHAPTER 11 |
| | : | |
| Debtor. | : | JUDGE BAISIER |

**EMERGENCY MOTION BY CHAPTER 11 TRUSTEE FOR AN ORDER CONVERTING THE CHAPTER 11 CASE OF THE DEBTOR TO A CASE UNDER CHAPTER 7 AND REQUEST FOR EXPEDITED HEARING**

**COMES NOW** S. Gregory Hays, as Chapter 11 Trustee ("**Trustee**") for the bankruptcy estate (the "**Estate**") of Atlanta Light Bulbs, Inc., Debtor (the "**Debtor**") in the above captioned case (the "**Case**") and, by and through counsel, hereby files this *Emergency Motion by Chapter 11 Trustee for an Order Converting the Chapter 11 Case of the Debtor to a Case under Chapter 7 and Request for Expedited Hearing* (the "**Motion**"). In support of the Motion, the Trustee respectfully shows the Court as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**PROCEDURAL BACKGROUND**

2. On April 15, 2022, Halco Lighting Technologies, LLC, Norcross Electric Supply Company and Candela Corporation filed an involuntary petition for relief under Chapter 11 of Title 11 of the United States Code (the **"Bankruptcy Code"**) against Atlanta Light Bulbs, Inc. in the United States Bankruptcy Court for the Northern District of Georgia (the "**Court**"). The

involuntary petition does not explain why this Case needs to stay in chapter 11 in light of the fact that the Debtor is not currently operating and has no business to reorganize.

3. On May 23, 2022, the Court entered an Order for Relief under Chapter 11 of the Bankruptcy Code [Doc. No. 21].

4. On June 15, 2022, the Court entered an order [Doc. No. 58] directing the appointment of a Chapter 11 Trustee on behalf of Debtor.

5. On June 17, 2022, the Court entered an order [Doc. No. 68] approving Trustee as Chapter 11 Trustee for Debtor. The Trustee is duly qualified to act in such capacity.

6. On June 23, 2022, the United States Trustee conducted and concluded the Section 341 meeting of creditors at which the Debtor's principal, Jessica Mendoza ("Mendoza") appeared and testified under oath for over an hour. The Trustee and certain creditors asked Mendoza a wide variety of questions regarding the business.

7. At present, the Debtor has not retained counsel to represent the Debtor in this Case. Mendoza has retained individual counsel.

## SUBSTANTIVE BACKGROUND

8. Since the appointment of the Trustee, the Trustee has conducted an initial and preliminary investigation of the business affairs of the Debtor to determine whether a reorganization is possible or feasible in this Case. Based on that investigation, the Trustee has determined that, among other potential problems, a reorganization would be problematic in large part because the Debtor is not currently an operating entity and has no employees, no equipment, no business location, no inventory and, most critically, no unencumbered cash. Indeed, according to Mendoza, the Debtor ceased operating on May 13, 2022 when she terminated all of the employees

9.      Prior to the Petition Date, the Debtor executed a certain promissory note in favor of Tandem Bank ("**Tandem Note**") in the amount of $600,000, along with the Commercial Security Agreement granting a security interest to Tandem in certain property of the Debtor. Although some payments of interest may have been made on this obligation, the Trustee is informed and advised that the entire principal amount, together with attorney's fees and default interest remains payable on the Tandem Note and that Tandem asserts a lien against the proceeds from the sale of any inventory of the Debtor.   The Tandem Note was separately guaranteed by Mendoza and Jesse Root ("Root") and Tandem Bank obtained pre-petition judgments against each of the Debtor, Ms. Mendoza and Mr. Root for $600,000, plus interest of $18,264.80, plus fees of $30,116.25, plus attorney's fees of $91,952.22 for a total of $740,333.27

10.     At present, the Estate does not have sufficient funds to restart operations or pay ongoing Chapter 11 administrative expenses, including attorney's fees and U.S. Trustee fees. Although Ms. Mendoza did turn over several customer checks that total approximately $7,000, these funds would likely constitute cash collateral of Tandem and the Trustee cannot (and will not) use these limited funds without Court permission.

11.     The Trustee has held discussions with the Committee and Mr. Root, a former stockholder in the Debtor, concerning a potential reorganization to be managed by Mr. Root. Unfortunately, however, there is no capital, financing or trade credit to fund a re-start of the Debtor's business operations.  Also, as noted above, Tandem asserts liens against all of the Debtor's assets.  While the Trustee's believes Mr. Root's intentions to be sincere and honorable, he too is subject the  $740,333 personal judgment mentioned above in favor of Tandem Bank. Further, there are not any other ready, willing or able buyers who are interested in purchasing the Debtor as a going concern.   Without available capital, financing or credit or the presence of a

3

legitimate buyer, it is the Trustee's business judgment that a reorganization is highly unlikely and risky, if not impossible.

12. To provide further background on the Debtor, the Debtor was in the lighting business for many years. Since approximately September 30, 2019, Mendoza served as the CEO of the Debtor and held a 50% ownership interest in the Debtor. After Mendoza acquired her 50% interest and took on a management role at the company, Root, the son of the founder of the Debtor and a party who had worked at the Debtor since 2008 and ultimately served as its Vice President of Sales in charge of the entire sales function of the Debtor, began to notice various financial irregularities at the business. Root has informed the Trustee that he therefore requested that Mendoza provide certain financial information and access to the books and records of the Debtor. Root claims that rather than share the requested financial information, Mendoza fired him from his longtime role with the company and he has not had an active role at the company since September 2021. Mendoza disputes these allegations and asserts that Root was fully advised of the financial status of the Debtor.[1]

13. During the 341 Meeting and in separate conversations with the Trustee, Mendoza has admitted that the financial records of the Debtor are not up to date. The Trustee has obtained only limited documents to date, does not have all bank accounts and has not untangled the financial records of the Debtor. As noted below, the Debtor's CPA have not seen financial statements since December 2019 and tax returns that have not been filed since 2019.

14. Among the few records turned over to the Trustee by Mendoza are the bank statements for the Debtor's account at PNC Bank. According to these statements, the Debtor received a payment in the amount of $1,500,000.00 on February 1, 2022. It appears that these

---

[1] The facts and circumstances regarding the departure of Root from the Debtor are sharply contested by Root and Mendoza, but ultimately not critical to this motion.

funds were received from the United States Small Business Administration as an Economic Injury Disaster Loan ("EIDL Loan").  The Debtor has been advised that the total amount of the EIDL Loan requested and received by the Debtor was $2,000,000.   Mendoza asserts that Root was fully involved in the application process for this loan.  The Trustee has not yet determined or investigated, the circumstances under which this loan was procured or whether there is any basis to seek forgiveness of the loan.

15. Almost immediately after receiving $1,500,000.00 on February 1, 2022, Mendoza wired $108,333.42 to herself and $108,333.42 to her significant other Robert Taitz ("**Taitz**"). Mendoza has claimed these payments were for back payroll and they are reflected as Executive Wages in the Oracle system.  In addition, on February 14, 2022 the Debtor wired $633,289.70 to a currently unknown payee.  Counsel for Mendoza has indicated the funds were wired to related company Atlantic Electrical Services, Inc. ("**AES**")  but has not provide any support for this wire transfer.  AES provides electrical services as is owned by Mr. Taitz and now operates out of the Debtor's former Tucker location with Debtor former employees. The Trustee has the bank records from PNC and is awaiting access to the account to see all transaction. The Trustee will trace the remaining funds received which have all apparently been dissipated and it is uncertain whether the funds were used for legitimate business purposes.

16. As of the filing of this Motion, the Trustee has not determined the amount of monies received by the Debtor from various COVID-related government assistance programs. Based on information currently available, the Trustee believes that the sources and uses of these funds should be investigated and traced and a determination made as to whether any loan forgiveness is possible.

5

17. The Trustee has also been granted access to an Oracle database containing limited financial information about the Debtor. The Trustee attempted to determine the amount of claims existing against the Debtor. As the Court and the Parties are aware, this is an involuntary case and no schedules have been filed. A report of payables generated from the Oracle system indicated that there are as much as $3.5 Million in trade payables, which would not include an approximate $740,000 debt to Tandem, a possible, undetermined deficiency claim by Ford Motor Credit and the EIDL loan in the amount of $2 Million.

18. With respect to Ford, upon the appointment of the Trustee, the Debtor was in possession of seven trucks that were allegedly used in the operations of the Debtor and subject to a security interest of Ford Motor Credit Company, LLC. The Trustee has been informed that three of the luxury $90K trucks were driven by Mendoza family members and were not use in the ALB business. Mendoza disputes this. The Trustee has abandoned the vehicles since the estate did not have any need for the vehicles or sufficient funds to pay insurance on the vehicles. Ford has now taken possession of the vehicles. The Trustee has been informed that Debtor does not own any other vehicles and verified no other vehicles were insured by the Debtor.

19. In February, 2022, Mendoza claims the Debtor vacated its premises at 2109 Mountain Industrial Blvd., Tucker, GA 30084 (the "**Tucker Location**"), but has not provided any documents to show that a new lease was signed. Various business entities, possibly related to the Debtor or owned or controlled by Mendoza or Taitz, including AES, appear to be currently using this facility. Ms. Mendoza indicates that certain inventory of the Debtor at the Tucker Property was purportedly moved to certain property located leased by the Debtor at 2 Sun Court, Suite 460, Peachtree Corners GA, 30092 (the "**Peachtree Corners Location**"). The Peachtree Corners Location was subsequently vacated by the Debtor and Tandem has an Order Lifting Stay

6

to recover certain assets. The Trustee did not locate any inventory at the Peachtree Corners Location and the Debtor does not have any other business locations. The Trustee has inspected some limited inventory at the Tucker Location and Tandem Bank asserts a lien on that inventory. The Trustee plans to abandon the inventory and warehouse shelving at the Tucker Location and to investigate the disposition of the Debtor's inventory.

20. Ms. Mendoza indicated at the 341 Meeting that the Debtor ceased operations on May 13, 2022 and no longer has any employees. Ms. Mendoza further indicated that former employees retained certain computers of the Debtor and that a good percentage of the employees of AES are former employees of the Debtor.

21. At this juncture, the Debtor has no employees, business location, inventory, equipment, unencumbered assets or unencumbered cash to use in a reorganization and attempting a reorganization would require a full restart of operations and funds to obtain inventory and satisfy expenses. The only assets in the estate may be avoidance claims and outstanding accounts receivable.

22. In short, the Debtor does not currently have any operations to reorganize and restarting the operations of the Debtor would require funds that are not currently available to the Debtor.

## **RELIEF REQUESTED**

23. By this Motion, the Trustee requests that the Court convert the Chapter 11 Case of the Debtor to a case under Chapter 7 as soon as possible.

24. Due to mounting Chapter 11 administrative expenses, the Trustee further requests that the Court set this Motion for hearing and determine the Motion on an expedited basis.

**BASIS FOR RELIEF**

25.     Section 1112(b)(1) of the Bankruptcy Code provides, in pertinent part, that "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 . . . for cause." 11 U.S.C. § 1112(b)(1). The term "cause" includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4).

26.     The fact that the operations of the Debtor have ceased "provides under a totality of the circumstances, reasonable grounds for 'cause' under section 1112(b)(1)—that is, 'continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation' constitute cause under section 1112(b)." *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992)(finding that conversion would best serve the interests of creditors where fact that debtors' business operations had ceased provided cause to justify such relief since the purposes of chapter 11 to encourage financial restructuring would not be served when there is no business left to reorganize). "Without a reasonable amount of assets and a feasibly operating business, there is no logic in continuing under Chapter 11 . To establish a reasonable likelihood of reorganization, the proposed rehabilitation must be more than a nebulous venture." *In re Tracey Serv. Co., Inc.*, 17 B.R. 405, 409 (Bankr. E.D. Pa. 1982)(finding that there was no realistic possibility of rehabilitating debtor where the debtor had no business premises, inventory, equipment, employees, or office and was not generating any income despite contention that debtor could be reorganized as a different kind of business).

27.     Soon after being appointed, the Trustee directed his counsel and accountant to conduct an investigation to determine whether a reorganization of the Debtor was possible in this Case. The Trustee and his advisors communicated and consulted with secured creditors, counsel

8

for the Committee of Unsecured Creditors, and former stockholder Root and his counsel, and interviewed Mendoza at the 341 Meeting of Creditors. Representatives of the Trustee, Tandem Bank, and Root traveled to the former business location of the Debtor on June 20, 2022 and investigated potential assets of the Debtor that could potentially be used for a reorganization of the affairs of the Debtor. The Trustee also conducted a partial review of the Oracle accounting system that is incomplete and does not contain accurate books and records of the Debtor and of its financial performance.

28.     This investigation has revealed several major challenges to a reorganization of the Debtor that indicate that the prospect of a successful reorganization is so unpromising that it is not warranted to permit the Case to proceed to confirmation with the attendant costs and unfair delays. First, the Debtor does not currently have any operations to reorganize and is not generating any income. Indeed, the Debtor does not even have any employees, business location, equipment, or inventory to be used in a restart of the operations of the Debtor. Ultimately, the Trustee determined that attempting to restart the operations will be both expensive and subject to a high execution risk. It is difficult to imagine a more difficult situation to formulate a plan of reorganization with no financing and an estimated $5 million in secured and unsecured debt with financial records that have not been properly maintained for over two years.

29.     Second, the Debtor does not have a viable financial source to finance the restart of the operations of the Debtor, attract and pay employees, or to even acquire inventory or pay the expenses of the Case. While three creditors have indicated a willingness to work with the Debtor, the Trustee has not identified creditors willing to offer capital, credit or financing to the Debtor. The Trustee has also explored discussions with counsel for Root concerning his interest in volunteering to manage the operations of the Debtor. Despite the sincere interest of creditors to

9

sell to the Debtor and of Root to try to save the business his father started many years ago, the absence of sufficient capital or financing remains a significant impediment. The Trustee is advised and informed that Mr. Root, after considering the information obtained to date by the Trustee and consultation with his own advisors, has determined that he is no longer interested in seeking a reorganization of the Debtor.  Under the circumstances, neither the Trustee nor the Debtor has the financial ability to restart the Debtor's operations or address the significant liabilities which would have to be addressed in any plan of reorganization.

30. Third, the liabilities of the Debtor are unknown given the status of the financials of the Debtor and proceeding under such circumstances poses substantial risk. For example, as noted above, the unsecured debts of the Debtor appear substantial.  Further, the tax status of the Debtor is unknown given that the Debtor has not filed tax returns since 2019. The professional fees associated with addressing the financial records of the Debtor may be significant and the Trustee is very concerned about the potential liabilities that may arise if Estate restarts and continues business operations of the Debtor.

31. In addition, the Trustee would not be able to start any new business operations without sufficient commercial liability, property and errors and omissions insurance which would also have to be separately obtained and paid for.  The Debtor received notice of cancellation of existing insurance policies for non-payment and is informed that the Debtor owes over $45,000 in premiums. The Trustee has not seen the insurance policies and plans to surrender any fixed assets before cancelling any other existing insurance.

32. Fourth, while the preliminary review of the financial information of the Debtor indicates that the operations of the Debtor were impaired by funds being diverted by Mendoza, the Trustee has seen evidence that the Debtor's business may not be financially viable. As an

initial matter, the low margins of the Debtor may suffer even more by operating in an uncertain economic environment. In addition to low margins and potential losses, the Debtor will incur significant professional fees during the Case. Absent a cash infusion or a cash payment from the sale of the business, the Debtor would not be able to pay the professional fees in the Case.

33. Fifth, the most significant asset potentially available to the Debtor may be the collection of outstanding accounts receivable and litigation claims. Such actions do not require the substantial risk and expense associated with attempting to restart and reorganize the operations of the Debtor.

34. Under the circumstances, the Trustee believes that sufficient cause exists to convert the Case to a proceeding under chapter 7 because: a) the Debtor does not currently have any operations and attempting to restart the operations without adequate financing will cause a substantial or continuing loss to or diminution of the Estate; b) the Debtor does not have a reasonable likelihood of rehabilitation and c) there does not appear to be any party willing to finance or purchase the business of the Debtor as a going concern. In the business judgment of the Trustee, the administration of the Case will be more effective and more efficient under Chapter 7 as the substantial or continuing loss to or diminution of the Estate makes reorganization unlikely. Moreover, the elimination of certain expenses unique to Chapter 11, such as U.S. Trustee fees and expenses related to the filing of monthly financial reports, should minimize expenses and ensure a maximum recovery to the creditors of the Estate of the Debtor. Indeed, the Trustee can still seek to sell the name, customer lists or other business information of the Debtor to potential buyers. The Trustee believes that: a) the limited resources of the Estate will continue to be wasted if the Debtor remains in Chapter 11 since continuing the Case in

Chapter 11 is simply an expensive exercise of futility; and b) conversion of the Case to a proceeding under Chapter 7 is in the best interests of the Estate, the Debtor, and its creditors.

35. Given the potential for further Chapter 11 administrative expenses that may otherwise be unnecessary, an expedited hearing on this Motion is in the best interests of Debtor and the creditors of the Debtor.

WHEREFORE, Trustee requests that this Court: (a) grant this Motion; (b) set this matter for hearing on an expedited basis; (c) enter an order converting the Chapter 11 Case of the Debtor to a proceeding under Chapter 7 pursuant to 11 U.S.C. §1112(b) effective as of the date of the filing of this Motion; (d) authorize the Trustee to continue as the Chapter 7 Trustee in the Case until further order of this Court; (e) direct the United States Trustee to appoint a Chapter 7 trustee for the bankruptcy Estate of the Debtor; and (f) grant the Trustee such other and further relief as the Court deems just and proper.

Date: July 1, 2022.

Respectfully submitted,

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com

PROPOSED COUNSEL FOR THE TRUSTEE

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day served the foregoing *Emergency Motion by Chapter 11 Trustee for an Order Converting the Chapter 11 Case of the Debtor to a Case under Chapter 7 and Request for Expedited Hearing* was served via the Court's ECF system to all parties registered with the system who have filed appearances and requested notices and via first class U.S. Mail, with adequate postage prepaid, on the following persons or entities at the addresses stated below:

This 1st day of July, 2022.

Respectfully submitted,

LAW OFFICES OF HENRY F. SEWELL JR., LLC

***/s/ Henry F. Sewell, Jr.***
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com

PROPOSED COUNSEL FOR THE TRUSTEE